## Case No. 16,104.

### UNITED STATES v. QUANTITY OF TOBACCO.

[Affirming Case No. 16,105. Nowhere reported; opinion not now accessible.]

## Case No. 16,105.

### UNITED STATES v. QUANTITY OF TOBACCO.

[5 Ben. 112; 3 Int. Rev. Rec. 158.] [1]

District Court, S. D. New York. May, 1871.[2]

INTERNAL REVENUE—EVIDENCE—FRAUDULENT INTENT—SALES—MANUFACTURED GOODS.

1. A fraudulent intent in respect to a particular importation of goods may be legitimately inferred by a jury from a previous fraudulent intent and previous fraudulent acts, shown in respect to previous importations.

2. The same kind of evidence is legitimate in prosecutions for the forfeiture of property under the internal revenue acts.

3. The internal revenue act of March 3d, 1865 [13 Stat. 468], which went into effect on the 1st of April, 1865, imposed a tax of thirty-five cents a pound upon certain tobacco, upon which the previous act had imposed a tax of twenty-five cents a pound. On the 31st of March, 1865, L., a tobacco dealer in New York, entered upon his sales-book a sale of about $60,000 worth of such tobacco to K. & W., who gave him their check for the amount. Two or three days afterwards he gave to K. & W. his check for the same amount. The tobacco never passed into the possession of K. & W., but L. kept it on his own premises, treat-

---

[1] [Reported by Robert D. Benedict, Esq., and here reprinted by permission. 13 Int. Rev. Rec. 158, contains only a partial report.]

[2] [Affirmed by circuit court; case not reported.]

---

ed it as his own, and disposed of it as such. In connection with that alleged sale, he entered a quantity of the tobacco in the tax-book, at that date, and returned it as sold: Held, that, under the 94th section of the act of June 30th, 1864 [13 Stat. 264], it was illegal for L. to return that tobacco for tax, because it was not sold, nor was it "removed for consumption," under the 91st section of the same act.

4. The fact of this tax of twenty-five cents having been paid on this tobacco by L., under the above circumstances, was no reason for his not returning for tax a sale of a portion of it in April and May, 1867, although the tax upon such tobacco had at that time been reduced to fifteen cents a pound, by the act of July 13th, 1866 [14 Stat. 98], notwithstanding the provision of the 70th section of the latter act.

5. Under the 90th section of the act of 1864, as amended by the 9th section of the act of July 13th, 1866, a manufacturer of tobacco is required to keep a book showing the goods manufactured by him as well as the goods he has sold.

6. Manufactured goods, under that section, means goods the manufacture of which is completed, so that the goods are in a condition to be sold.

[Cited in U. S. v. 16 Barrels Distilled Spirits, Case No. 16,300.]

7. It appeared to be the manner of doing business in the warehouse of L., to enter for tax on a certain day a large mass of tobacco, which was then taken down stairs into the retail counter department, where it was sold at retail, no record being kept of such sales: Held, that this was an illegal mode of doing business; that there was no sale when the property was taken to the retail counter; and that, under the 90th section of the act of 1864, as amended by the act of July 13th, 1866, a record of the sales at the retail counter should have been kept, and an abstract of such sales returned by the 10th day of every month.

[This was an information of forfeiture against a quantity of tobacco claimed by C. H. Lilienthal.]

Thomas Simons, Asst U. S. Dist. Atty.

Thomas Harland, Benjamin K. Phelps, and Daniel G. Rollins, Jr., for claimant.

BLATCHFORD, District Judge (charging jury). This case has occupied your attention for a long time, this being the nineteenth day since we entered upon its consideration. It is one of a class of cases which, as you have perceived, requires, in its examination by the counsel, the court and the jury, the exercise of patience and forbearance, in investigating matters of great tediousness. The consumption of time is inseparable from the character of the inquiry, and was, in my judgment, absolutely necessary. The trial was commenced in the expectation and with the intention, on the part of the district attorney, of saving the time of the court and jury from being taken up with an examination of the books, if an accurate transcript and faithful representation of their contents, made out of court, could be presented. But, on an examination, it was quite apparent that the "callings," as they have been denominated, which were made and were sought to be put in evidence, were not reliable. That fact was admitted by the dis-

trict attorney. Therefore, great injustice would have been done to the claimant, if those "callings" had been put before the jury as a true transcript of the books, instead of having in evidence the books themselves. Moreover, an examination of the books by witnesses on the stand, in the presence of astute counsel on both sides, and of the court and jury, clears up everything as we proceed, and leaves nothing vague or doubtful. If any difficulty or embarrassment arises, the proper witness is on the spot to explain it. We have had an examination of these matters in Mr. Lilienthal's establishment, under circumstances the most favorable for the investigation, in a court of justice, of questions of this kind. We have had the gentlemen most intimately concerned in and connected with these transactions, the parties themselves who made the entries in the books, Mr. Denneker and Mr. Davis, gentlemen of intelligence, and who have given their testimony in a manner, so far as imparting information is concerned, entirely satisfactory to the court and the counsel, and, I doubt not, to yourselves. Again, all the books that have been called for have been presented. The district attorney, versed in these matters, has been assiduous, persevering and untiring. The counsel for the defence are gentlemen more eminently qualified for an investigation of this kind than any counsel at the bar, one of them having heretofore held the high position of deputy commissioner of internal revenue, under the government of the United States, and the others having fitted themselves for these investigations by long service in the district attorney's office, in the prosecution of like matters on behalf of the government. Therefore, nothing has been wanting, in this case, to the elucidation of the truth, so far as it can be ascertained from the books kept by Mr. Lilienthal, and from the testimony of his foreman and others in his establishment. And it is a result of this entire and thorough competency of the counsel on both sides, that that happens in this case, which rarely happens in any case tried before this court or any other court, that the court is able to assent, and does assent, as I shall hereafter state to you, to all the propositions of law presented on both sides of this case, as requests to the court to charge the jury, leaving merely a question of fact for your consideration. And I desire, gentlemen, to say to you, in the outset of my remarks, that it is for you solely, under your oaths, in the discharge of your duties as jurors, to pass upon that question of fact, uninfluenced, in your determination, by any suggestion or opinion that you may suppose the court holds on any matter of fact, taking the law as given to you by the court, and exercising your own independent, unbiassed, uninfluenced judgment upon the facts, to come to a righteous conclusion.

The issue in this case is a very plain one.

The prosecution is founded on the 48th section of the act of June 30th, 1864, as amended by the 9th section of the act of July 13th, 1866 (14 Stat. 111), a section enacted at a comparatively early day in the history of the internal revenue acts of this country, and which has remained on the statute book, with some modifications, ever since, and has been enforced in a great many cases. Its provisions are these—that where any property, subject to a tax under a law of the United States, is found in the possession of any person with intent to sell it, or remove it, or dispose of it, without paying the tax upon it, or without having the tax paid upon it, or with intent to defraud the internal revenue laws of the United States, such property, so found, under such circumstances, in the possession of any person, with such intent, shall be forfeited to the United States, and may be seized, as this property was in this case, and be proceeded against in the manner in which this property is being proceeded against in this suit. The same section provides, that if any raw materials are found in the possession of any person, he having the intent, in respect to them, when they are so found in his possession, of manufacturing them into articles subject to tax, in respect to which articles he intends that the tax shall not be paid, or that the revenue shall be defrauded, such raw materials shall be forfeited to the United States. The same section goes on to provide, that, under such circumstances, not only shall the articles subject to tax, and the raw materials, be forfeited, but all personal property, of any kind whatsoever, found on the same premises where such offending articles, so to speak, are found, shall be forfeited. There has been seized, in this case, not only tobacco in a manufactured state, subject to tax, but also a large quantity of raw materials—raw tobacco, and other raw materials—and a large quantity of personal property connected with this establishment. The report of the appraiser values the entire property at $104,000. In that amount it was bonded, and delivered to the claimant, and the government accepted what it regarded as a satisfactory bond, in place of the property. It is this $104,000 worth of property, consisting generally of tobacco subject to tax, raw materials, and other personal property, found in this establishment, that is the subject of this suit.

It is for the government to satisfy you that this property was in this establishment, with the intent mentioned, in respect to it, on the part of those in whose custody and control it was. For the purpose of making the matter clearly definite, I will read the language of the statute: "All goods, wares, merchandise, articles or objects on which taxes are imposed by the provisions of law, which shall be found in the possession or custody, or within the control, of any person or persons, for the purpose of being sold

or removed by such person or persons in fraud of the internal revenue law, or with design to avoid payment of said taxes, may be seized by the collector or deputy collector of the proper district, or by such other collector or deputy collector as may be specially authorized by the commissioner of internal revenue for that purpose, and the same shall be forfeited to the United States, and also all raw materials found in the possession of any person or persons intending to manufacture the same into articles of a kind subject to tax, for the purpose of fraudulently selling such manufactured articles, or with design to avoid the payment of said tax, and also all tools, implements, instruments, and personal property whatsoever, in the place or building, or within any yard or inclosure, where such articles or such raw materials shall be found, may also be seized by any collector or deputy collector, and the same shall be forfeited as aforesaid." The district attorney has stated to you, in his summing up, the various grounds upon which he claims the forfeiture of the property seized, that is, the various grounds upon which he maintains that he has proved the existence of this intent, in respect to the taxable tobacco and the raw materials and other property seized in the factory of Mr. Lilienthal. As you have seen, the testimony is entirely testimony in regard to what are alleged to have been previous acts of omission and commission, on the part of Mr. Lilienthal and persons in his establishment, in respect to the conduct of their business at previous times, in relation to the internal revenue laws of the United States. That is a class of evidence which, as has been expressly adjudicated, in many cases, by the supreme court of the United States, is perfectly competent and legitimate evidence from which to infer a fraudulent intent in respect to existing property. It has been held in respect to the importation of goods at the custom house, that a fraudulent intent in respect to a particular importation of goods may be legitimately inferred by a jury from a previous fraudulent intent and previous fraudulent acts, shown in respect to property previously imported through the custom house. There is a large class of cases on that subject, and the doctrine has been recently applied to an action under the internal revenue laws, by the circuit judge of this circuit, in a case in the Northern district of New York, in regard to distilled spirits. It is, therefore, a class of evidence that can be legitimately appealed to, and is appealed to, in all cases of this kind. Sometimes it is accompanied by other evidence, in respect to an existing intent, in regard to property seized. Sometimes property seized is found concealed, and, to support the idea that fraud was intended in regard to it, previous fraudulent acts are given in evidence. Sometimes, as in this case, the evidence consists almost entirely of testimony in regard to previous

acts, and to what is claimed by the district attorney to have been the fraudulent intent existing in such previous acts.

I shall call your attention particularly to the various matters that are relied on by the district attorney. The first one is in regard to what is called "extra long smoking tobacco," a species of tobacco in regard to which it may be generally stated, that it has in it a very large proportion of stems. It is a kind of tobacco which, according to the evidence, was manufactured in this establishment, as a part of its ordinary business, prior to the 1st of August, 1866, at which date commenced this series of returns, seventeen in number, which are the main subjects of consideration in this case. It is a species of tobacco that was manufactured previous to that time, and returned month by month in the monthly returns. That date is taken in this case, because it is the date when the act of July 13th, 1866, changing the rate of duty on various descriptions of tobacco, went into operation. Previous to that time, the act imposing a tax on tobacco was the act of March 3, 1865 (13 Stat. 469). That act of March 3, 1865, divided smoking tobacco into two classes, for taxation. One class, made exclusively of stems, was taxed fifteen cents a pound; and smoking tobacco of all kinds not included and provided for under the fifteen cents clause, was taxed thirty-five cents a pound. It appears, from the evidence, that the "extra long smoking tobacco" so made in this establishment prior to August 1st, 1866, and so being made in it when the act of July 13th, 1866, was passed, had been, up to the 1st of August, 1866, returned by Mr. Lilienthal as "smoking tobacco," under this thirty-five cents clause, and not under the fifteen cents clause. Not being made exclusively of stems, it was not liable to the fifteen cents tax, and, therefore, it was liable to the thirty-five cents tax. It also appears that, for some twenty days or so after the 1st of August, 1866, when this new law of July, 1866, went into effect, this "extra long smoking tobacco," which had, before August 1st, 1866, been returned at thirty-five cents, was returned by Mr. Lilienthal as liable to a tax of forty cents, under a clause in the act which so went into effect August 1st, 1866, and was returned by him under the head of "chewing tobacco." The reason stated by the claimant for returning such tobacco as "chewing tobacco" is, that there was no place to insert it in the form of return, except under the head of "chewing tobacco." It had, however, been previously returned as "smoking tobacco," and it was called "smoking tobacco" in the price lists issued by the claimant. After it had been returned for some twenty days after the 1st of August, 1866, as liable to a tax of forty cents a pound, it was at all times thereafter returned by the claimant as liable to a tax of fifteen cents a pound. It was continued at that rate throughout all the returns, down

to the 31st of December, 1867, and all the smoking tobacco of every kind that was returned by the claimant in all the returns made by him during all the seventeen months, was returned at fifteen cents a pound, and no smoking tobacco was returned at forty cents a pound. There was no class of thirty-five cents smoking tobacco in the act of July, 1866. The only classes of smoking tobacco in that act were these two—smoking tobacco, sweetened, stemmed or butted, forty cents per pound; and all smoking tobacco not sweetened, nor stemmed nor butted, including that made of stems or in part of stems, and imitations thereof, fifteen cents per pound. A great deal was said in this case, on the argument to the court, as to the proper construction of the act of July, 1866, in regard to the tax on this "extra long smoking tobacco." You will recollect that, during the greater part of the seventeen months after the 1st of August, 1866, all except a very small portion of the time, at the commencement, this "extra long smoking tobacco" was prepared by putting into it rather more stems, say ten pounds more in every ninety pounds of product, than they had been in the habit of putting in before the 1st of August, 1866. It always had had a large proportion—not a preponderance—of stems in it, although it was not made exclusively of stems. I do not consider it necessary, in this case, to determine what is the proper interpretation of this fifteen cents clause in the act of July, 1866, or under what head in that act, as a matter of law, this "extra long smoking tobacco," manufactured in the manner described by Mr. Denneker, properly falls. The facts, to recapitulate them, about which there is no dispute, in regard to this "extra long smoking tobacco," are, that at the time this act of July 13th, 1866, went into effect, Mr. Lilienthal was manufacturing this "extra long smoking tobacco;" that, previous to that time, he had returned it at thirty-five cents a pound, as "smoking tobacco," under the act of March 3, 1865; that, after the act of July, 1866, went into effect, and until about the 20th or 21st of August, 1866, he returned it at forty cents a pound: and that, after that time, the mass, if not all of it, during the entire residue of the seventeen months, was returned at fifteen cents a pound, there being no difference whatever in the tobacco during all the periods when it was so returned at the several rates of thirty-five, forty and fifteen cents, except that, during almost all of the seventeen months, commencing with August, 1866, it contained, in every ninety or one hundred pounds, ten pounds more of stems than it had, before August, 1866, been in the habit of containing. The quantity of it in the returns for such seventeen months was quite large. The district attorney claims that the average was about five thousand pounds a month; and, at all events, the quantity was considerable.

The district attorney has addressed to you an argument for the purpose of showing that, no matter what the interpretation of the act of July, 1866, may properly be, the conduct of Mr. Lilienthal in regard to this "extra long smoking tobacco" shows an intent on his part throughout to defraud the government in regard to the tax upon such tobacco. It is for you to say whether you believe that he has established the proposition for which he contends. The theory on the part of the defence is, that, because this tobacco had some stems in it, it was liable to a tax of fifteen cents a pound; that, at all events, Mr. Lilienthal, reading the law for himself, had a right to think that it was capable of a double interpretation; and that there could be no fraudulent design or intent on his part, until his attention was in some way called to the subject, or until the matter had been judicially determined. The district attorney on his part, contends, that if, to put any stems whatever into the tobacco, reduces it to a fifteen cents tax, it makes no difference how much stems there are in it, whether more or less; and that, therefore, the testimony in regard to putting more stems into this tobacco, has no bearing upon any honest transaction in regard to this matter. In other words he claims, that if the ground taken by Mr. Lilienthal at the time, that this tobacco was liable to the fifteen cents tax, because it had some stems in it, was correct, and that all tobacco, under the act of July, 1866, which had any stems in it, or was made in part of stems, was liable to fifteen cents a pound tax, and not forty cents, then it was absurd to put in any more stems, because the quantity of stems that was in already was entirely sufficient to bring the tobacco within the fifteen cents tax. It is for you to say what force and weight you will give to this argument. In that connection, the district attorney calls attention to the fact, that, all through the seventeen months, all the smoking tobacco that was returned by Mr. Lilienthal was returned at the fifteen cents rate, and none was returned at forty cents a pound. He also claims, that the books of Mr. Lilienthal show, that Mr. Lilienthal had a purpose to benefit himself, and not to deal honestly with the government, in this—that what was returned by him at forty cents a pound, during the short time he returned it at that rate, after the act of July, 1866, went into operation, appears by the books to have been sold at seventy cents a pound, and, when he returned the tobacco at fifteen cents a pound, thus reducing the tax by twenty-five cents a pound, he reduced his price to the purchaser by only ten cents a pound, for the same tobacco, with the same increased quantity of stems in it, thus making to himself a clear difference in his own favor, as is claimed, of fifteen cents a pound, out of the twenty-five cents a pound reduction in the tax. That is claimed by the district attorney to be

a circumstance to be taken into consideration. It is also claimed by the district attorney, that there is no evidence to show that the government had any information until February, 1867, as to how this "extra long smoking tobacco" was made; that, at that time, when such information was communicated to Mr. Van Wyck, the collector, as is shown by his letter of March, 1867, to the internal revenue office, he supposed the state of facts to exist which is disclosed in that letter, namely, that the identical stems which were taken out of the tobacco for the purpose of being subjected to this treatment, which would assimilate them to leaf tobacco in appearance and, perhaps, in flavor, were put back with the leaves from which they were taken; that the internal revenue office, when, in August, 1867, it replied to the letter of Mr. Van Wyck, acted upon that idea, and in this way—that, while the act of July 13th, 1866, said that smoking tobacco stemmed should pay a tax of forty cents a pound, the commissioner of internal revenue stretched a point in favor of the tobacco manufacturers, by saying to them: "Although you take away physically the stems from the leaves, in the course of your manufacture, so that, in one sense, the tobacco is stemmed, nevertheless, for the purpose of giving you the privilege of putting those stems through this manipulation, we will consider that that tobacco is not stemmed, provided you put back those identical stems with the leaves to which they belong." The district attorney also contends, that, inasmuch as the claimant returned this tobacco, under the act of 1865, at the rate of thirty-five cents, and then returned it for a little while, under the act of 1866, at forty cents, and then changed the rate to fifteen cents, he has not shown honesty and good faith, because it does not appear that he laid all the facts before the internal revenue department, and asked what the tax on the tobacco should be, but put it down, month after month, at fifteen cents a pound, without raising the question whether the rate ought not, perhaps, to be forty cents. These I understand to be substantially the views urged on the part of the government in regard to that question. You will perceive that those views are, as I said before, entirely irrespective of any determination, as a matter of law, as to what in fact the tax on that tobacco was: and it is for you to say what inference you will draw from all this testimony, in regard to the intent Mr. Lilienthal had in respect to this "extra long smoking tobacco." The question applies to the entire series of months from August, 1866, to December, 1867. This seizure took place in March, 1868; and it appears, from the inventory of the property seized, that there was among it a considerable quantity of "extra long smoking tobacco," some of it loose, and some of it in papers. These are all the remarks which it seems necessary to make to you in regard to this "extra long smoking tobacco."

The next subject is the Orinoco tobacco, which was sent to California in April and May, 1867—on the 13th of April 3,600 pounds, and on the 29th of May 3,400 pounds. It is admitted, that this tobacco was not returned for tax at that time—April and May, 1867. There is no dispute that it was sent out of the establishment at that time; that it was removed for sale at that time; that it was sent to California to be sold at that time; and that it was not put into any return at that time. If it had been put into a return at that time, there is no dispute that it would have come under the fifteen cents tax, under the act of 1866, because it was tobacco which had not been in any manner stemmed. It was leaf and stem together, just as it grew, pressed into a mass, into a cake. Not having been stemmed, it was not subject to a duty of forty cents a pound, and it fell directly under the fifteen cents clause, as smoking tobacco, not stemmed. The history of that tobacco, as developed, is this: It was returned for tax, as a portion of a larger mass of the same description of tobacco, Orinoco tobacco, on the 31st of March, 1865, the day before the 1st of April, 1865, and the day before the act of March 3d, 1865, went into effect. That act of March 3d, 1865, imposed a higher tax upon that description of tobacco than it had been previously subject to under the act of June 30th, 1864. Under the act of June 30th, 1864, that tobacco was liable to a tax of twenty-five cents a pound. The provision of that act was—"Smoking tobacco, manufactured with all the stem in, the leaf not having been butted or stripped from the stem, twenty-five cents per pound." Under the act of March 3d, 1865, which was to go into effect on the 1st of April, 1865, this tobacco, which, up to the close of the 31st of March, 1865, was liable to a tax of twenty-five cents a pound, would have been liable to a tax of thirty-five cents a pound, being an increase of ten cents a pound. Mr. Lilienthal at that time went through the process that was developed on the trial, and stated by himself in his testimony of entering upon his sales book a sale, or a transaction as a sale, of the mass of the Orinoco tobacco of which this 7,000 pounds, which were afterwards sent to California, in April and May, 1867, formed a part, and of a large quantity of other tobacco, in all some $60,000 worth, to a house in this city, Kearney & Waterman. Kearney & Waterman gave him their check for that amount, and, two or three days afterwards, he gave to Kearney & Waterman his check for the same amount. The tobacco was not removed from his establishment, and never passed into the possession of Kearney & Waterman. Mr. Lilienthal kept it on his own premises, and, after he bought it back, (as the expression is), he treated it as his own, and disposed of it as such. In connection with such alleged sale in that way to

Kearney & Waterman, on the 31st of March, 1865, Mr. Lilienthal put that Orinoco tobacco into the tax book, at that date, at the rate of twenty-five cents a pound, and returned it as sold. He told you frankly on the stand, that he went through this operation because, under the law of 1865, there was going to be a higher duty on such tobacco. He kept the tobacco on hand so long that there came another change in the law, and, by the time he sent it to California, if he had not paid any tax on it before, he would have had to pay on it a tax of only fifteen cents a pound. It is my duty to say to you, that that transaction was utterly illegal. The 94th section of the act of June 30th, 1864, under which Mr. Lilienthal was acting at the time he returned this tobacco for tax, on the 31st of March, 1865, before the act of March 3d, 1865, went into effect, provided as follows: "Upon the articles, goods, wares and merchandise, hereinafter mentioned, except where otherwise provided," which includes this tobacco taxable at twenty-five cents a pound, "which shall be produced and sold, or be manufactured or made and sold, or be consumed or used by the manufacturer or producer thereof, or removed for consumption or for delivery to others than agents of the manufacturer or producer, within the United States or territories thereof, there shall be levied, collected, and paid the following duties, to be paid by the producer or manufacturer thereof." It is perfectly clear that that transaction was no real sale of the property. It was not intended to be a sale. It was, as it has been well characterized here, a perfect sham, from beginning to end. Now, it was illegal to return the Orinoco tobacco for tax, because it was not sold, nor was it removed for consumption. The words "removed for consumption," in the act of 1864, are defined by the provisions of the 91st section of the same act. The property must be removed from the premises of the manufacturer in good faith, with a then present intention to have it consumed, as against the will of the manufacturer and owner of it, giving a right to another person to put it into consumption, or the property in it must in some way be changed, or it must be sent for sale on commission, or, in some way or other, an intention to put it into the category prescribed by the act must be manifested in regard to it. But this property, you will remember, remained on the premises of Mr. Lilienthal, not disturbed in any manner, and was returned for tax under the circumstances stated.

It is claimed, on the part of the defence, that, inasmuch as the tax of twenty-five cents a pound had once been paid on this Orinoco tobacco, there was no obligation on the part of Mr. Lilienthal to make a subsequent return of it, and to pay another tax on it; and that this was the case, a fortiori, if, as was the fact, at the time the tobacco was sent to California, the tax on it would have been fifteen cents a pound. In this connection, reference was made to the following provision in the 70th section of the act of July 13th, 1866, which went into effect on the 1st of August, 1866, and was in force when this Orinoco tobacco was sent to California, in April and May, 1867: "All manufactures and productions on which a duty was imposed by either of the acts repealed by this act" (which embraces the provisions imposing duties on tobacco contained in the previous act of June, 1864, which was the act in force when this tobacco was returned for tax on the 31st of March, 1865), "which shall be in the possession of the manufacturer or producer, or of his agent or agents, on the day this act takes effect, the duty imposed by any such former act not having been paid, shall be held and deemed to have been manufactured or produced after such date." The defence contends, that the duty on this tobacco had been paid, within this provision. But that is not the law. The law says—all manufactures "on which a duty was imposed," "the duty imposed" by the act of 1864 not having been paid. Now, no duty was imposed upon this Orinoco tobacco. A duty was imposed upon it only when it was sold in good faith or removed for consumption. There was no duty imposed upon it at the time it was returned for tax at twenty-five cents a pound. The claimant had no right to return it at twenty-five cents, particularly when it is acknowledged by himself, on the stand, that he did so for the purpose of getting rid of the coming thirty-five cents duty, and, when, therefore, it is clear that there was an intent to commit a fraud on the government. The act of 1866 only applies to the payment of a duty which has been imposed. Otherwise, a party would be able to take advantage of his own wrong, by paying a tax of twenty-five cents a pound for the purpose of getting rid of a tax of thirty-five cents that was going into effect the next day, and paying the tax when the law gave him no right to pay it, and afterwards to say that, because he had paid it, there was no intent to defraud the government, and that thus the fraud so committed was condoned. The law is not so. The law merely says, that if a tax which has been imposed has been paid, no tax can be collected again on the same article. You are to consider the question not solely in the light of the fact that the law happened to be altered again, and the duty to be reduced from thirty-five cents to fifteen cents a pound, before the tobacco was sent to California, but, also, in the light of what Mr. Lilienthal did, and what his intent was, in regard to the tobacco, as bearing upon his intent in regard to the tobacco found in his possession when his establishment was seized.

The district attorney has called your attention, very properly, to the fact, that the law,

in all its provisions, aims at this—that manufacturers of tobacco shall not be allowed to aggregate in their establishments large quantities of tax-paid goods. An account is to be kept of goods sold, as they are sold and removed. They are to be removed from the premises—removed for consumption. They are not to be returned in masses, at the pleasure of the manufacturer at a given time, without being disturbed in any manner or removed from his establishment, so that he may be enabled to have on hand a large mass of goods, from which he can say, at any time, that any particular goods sold which cannot be traced were taken. These considerations, addressed to you, are considerations of force, and are to be taken into view by you in judging of the intent with which a manufacturer aggregates upon his premises, without removing therefrom, a large quantity of tax-paid goods, such a practice being against all the provisions of the law, and directly unlawful in respect to this Orinoco tobacco so returned for tax on the 31st of March, 1865.

The next subject in regard to which the district attorney claims that a fraudulent intent is shown on the part of Mr. Lilienthal, is in respect to the account which, by the 90th section of the act of 1864, as amended by the 9th section of the act of 1866, is required to be kept by every tobacco manufacturer. We have had exhibited here all the books on the subject kept in this establishment. They appear not to be blank forms printed, but to be entirely in writing. This one is headed—"Account of tobacco and snuff sold by C. H. Lilienthal in the year 1867." The heading is all in writing. This one that preceded it appears to have a heading in print. But, in regard to both of them, it may be said, that they embrace nothing but goods sold. They in no manner embrace, or pretend to embrace, goods manufactured. The earlier book is headed—"Quantity of tobacco and snuff sold and consumed, and removed for sale or consumption from the factory;" and the later book is headed—"Account of tobacco and snuff sold." In regard to this matter the law is explicit. It requires every manufacturer of tobacco, snuff or cigars, to "keep in book form an accurate account of all the articles aforesaid thereafter purchased by him, the quantity of tobacco. snuff, snuff-flour or cigars, of whatever description, manufactured, sold, consumed or removed for consumption or sale, or removed from the place of manufacture." It is perfectly clear that in this case, no such book was kept by Mr. Lilienthal, and no book showing in any manner the manufactured goods, but showing only those that were sold. "Manufactured" goods means goods the manufacture of which is completed, so that the goods are in a condition to be sold, and so that all that needs to be done, if a purchaser asks for them, is to deliver them. No account of such goods was kept. When the manufacturer comes to make up his abstract and hand it in to the assessor, he is not required to hand in an abstract of goods manufactured. He is required to hand in only an abstract of goods purchased, sold or removed. But Mr. Lilienthal, as you perceive, had, in the abstracts returned by him, a column for goods manufactured, as well as one for goods sold and removed for sale. He had no book, however, from which he could obtain any entries to put into the column of goods manufactured, because no such book was kept, and therefore, that happened which you naturally expect would happen. He filled up the column of goods sold, in the abstract furnished to the government, from the book, kept by him, of goods sold: and, when he came to fill up the column of goods manufactured, having no record of them, he put down, in every case, as manufactured, the same quantity which he put down as sold.

It was a clear violation of law, not to keep an account of goods manufactured. The reason why the law requires this book of goods manufactured to be kept, although it does not require the abstract returned by the tenth day of each month to set forth the goods manufactured, is, that the manufacturer is required to furnish a statement or inventory every January, setting forth all the property he has on hand in his business, and what portion of the goods was manufactured or produced by him, and what portion was purchased from others. Therefore, unless a record be kept of goods manufactured, it is impossible for the manufacturer to comply with the law, by handing in every January a true statement of all the goods on hand, specifying which of them were manufactured or produced by him, and which of them were purchased.

The district attorney has also called your attention to the inventories furnished by Mr. Lilienthal, for 1867 and 1868, and to what he claims are discrepancies between them and the monthly returns made to the government. It is for you to say what inference you will draw therefrom with regard to any intent on the part of Mr. Lilienthal. The twelve returns for 1867, in respect to chewing tobacco, correspond throughout, in the columns for manufacture and sale, so many pounds being manufactured, and the same number of pounds being sold, in the same month. As a matter of course, the quantity of manufactured chewing tobacco set forth as on hand in the inventory of 1868 ought not to have been greater or less than the quantity on manufactured chewing tobacco set forth as on hand in the inventory of 1867; and yet the district attorney states that the two inventories differ in that respect. So, in regard to fine-cut shorts, the two columns for manufacture and sale are alike in the twelve returns for the year 1867, and yet the two inventories do not correspond in respect to fine-cut shorts. So in regard to smoking tobacco, the district attorney claims there

is a like discrepancy. He also claims, that the Orinoco tobacco, if it was sold and bought back, ought to have been returned as purchased goods on hand on the first of January, 1867, whereas he claims it was not so returned. All these circumstances are commented upon by the district attorney, for the purpose of inferring from them an intent on the part of Mr. Lilienthal throughout, in the manner in which he kept his books, and in the manner in which he returned for tax, under the act of 1865, the tobacco which he had on hand when that act went into effect, and in the fact that he kept on hand a large quantity of tax-paid tobacco, contrary to the policy of the law, not to deal honestly with the government, but to violate the law, and thence of inferring a fraudulent intent in regard to the goods on hand in his establishment when it was seized.

The last subject to which attention was called by the district attorney, was the result of the examination of the books of the claimant. It appears from them, in respect particularly to that which occupied so much time in the investigation—the Orinoco tobacco, and the Killikinnick tobacco—that there are large quantities of granulated tobacco found in the order books that are not found, in the same specific items, in the tax books, and large quantities of granulated tobacco returned for tax in the tax books, which cannot be identified with any specific items in the order books. A great many items were identified, and, in regard to those which could not be, you will recollect the testimony of Mr. Denneker. When asked: "Where did the granulated tobacco come from which filled the orders in the order books, which cannot be identified as items in the tax books?" It was part, he said, of a large mass that had been entered for tax on a certain day, and taken down stairs into the retail counter department. Under the law, that was a wholly illegal mode of doing business. Mr. Lilienthal had no right arbitrarily to take a quantity of Killikinnick tobacco and return it for tax, and remove it down stairs into his retail counter department, or into any other part of his premises, and peddle it out by the pound from day to day for an indefinite period of time. When it was so entered for tax, as I stated before in regard to the Orinoco tobacco, it had not been sold, and it was not removed for consumption, within the law. Removing it from up stairs to down stairs was not a removal for consumption, within the meaning of the statute. In addition to that, it is admitted that, when tobacco so taken in masses, and returned for tax, and then taken down stairs to the retail counter, was sold at the retail counter afterwards, no record of those sales was kept, in any manner whatever. The 90th section of the act of 1864, as amended by the act of 1866, requires, that a record shall be kept of all sales, and that an abstract of such sales shall be returned by the tenth day of every month. This property, when it was taken from up stairs to the retail counter room, was not sold by Mr. Lilienthal to anybody. It was not sold to himself. It was not removed from his premises for consumption. It was taken from up stairs and brought down stairs, and, when it was so sold over the counter, no record of it was kept, in utter violation of the statute, and no abstract of it was returned, in violation of the statute. Mr. Lilienthal arbitrarily took three hundred or four hundred pounds and returned it for tax to-day, and then carried it down stairs, and then kept no record whatever of its subsequent sale. So that the purpose of the law was defeated by this transaction, because the government could have no means, when it got hold of Mr. Lilienthal's books, of tracing the sales of the tobacco. The fact that the government has been foiled in tracing such sales has been demonstrated here, because, no record of the sales having been kept, whenever any order which was found in the order book could not be identified with an item in the tax book specifically returned as so many pounds, Mr. Denneker testified that the order was filled out of the masses of tobacco which so went down stairs to the retail counter. The business, therefore, was conducted in such a manner as to deprive the government of what the law designed to provide, namely, a check over the transactions of tobacco manufacturers.

I have thus gone over the books of the claimant. It was necessary that I should show you what are violations of the law, in order that, if you should come to the conclusion, from the evidence, that such violations of law, in point of fact, took place, and that they showed an intent on the part of Mr. Lilienthal to defraud the revenue, you might have before you the law and the facts from which the district attorney claims that you have a right to infer a fraudulent intent on the part of Mr. Lilienthal, in respect to the tobacco on hand at the time of the seizure. I do not design to intimate any opinion whatever in regard to any intent on the part of Mr. Lilienthal in respect to these matters. But the facts in this case are undisputed. There is no serious contest about a single fact, except in regard to the every point of the law—the intent. On the part of the claimant, it is claimed, that the investigation before you has shown that, in point of fact, the government has not proved that it has been deprived of any tax; and, also, that it has been shown affirmatively, by an examination of the books, that the government has received all the taxes to which it was entitled, upon all goods which passed out of the establishment of Mr. Lilienthal prior to the seizure. You have heard all the evidence and the summing up on that subject, and it will be for you to say what is your belief on that subject, as bearing on the question of Mr. Lilienthal's intent in respect to the goods seized.

I shall now read to you the instructions prayed by the claimant. The instructions of law are twelve in number, to all of which I

assent. The thirteenth and fourteenth instructions, which are requests to charge as to the facts, I decline to charge, as not being questions of law.

The first proposition on the part of the claimant is this, and I assent to it: "If the jury shall believe that the returns for taxation of the tobacco known as 'extra long smoking tobacco,' between August, 1866, and the date of seizure, were made in good faith, and with an honest belief on the part of Mr. Lilienthal and his agents concerned or employed in the preparation of said returns, that said tobacco was liable to the fifteen cents rate of duty, and to no other or higher rate, then, even though said tobacco was by law liable to the forty cents rate of duty, the jury cannot, for that cause, find a verdict for the government, under section forty-eight."

The second proposition is this: "In order to forfeit the property proceeded against in this action, or any part thereof, the jury must be satisfied, either, first, that, at the time of the finding thereof," that is, on the 25th of March, 1868, "the manufactured articles, or some of them, were held by the persons in whose possession they then were, with a purpose, then existing, of selling or removing the same in fraud of the internal revenue laws, or with a design, then existing, to avoid payment of the taxes imposed thereon; or, second, that the persons in whose possession the raw materials were found, held them, at the very time of such finding, with intent to manufacture the same into articles of a kind subject to tax, for the purpose of fraudulently selling such manufactured articles, or with design to evade the payment of said tax." That is correct.

The third proposition, to which I assent, is this: "Fraudulent intent and fraudulent acts long prior to the time of the finding and seizure of the property in this action, (if any such existed), cannot warrant a verdict of condemnation, unless accompanied or supported by evidence of fraudulent intent or fraudulent acts at a period nearly coincident with the time of seizure, and, if the jury believe that, for the ten months next prior to the seizure, the claimant properly made returns, and paid taxes upon his manufactures, they may fairly infer therefrom a discontinuance of any fraudulent intent which he might have had previously."

The fourth proposition I assent to: "Even if the jury find that a fraudulent intent existed in the mind of Mr. Lilienthal at the time of making the return of the Kearney & Waterman tobacco, so called, in March, 1865, that fact of itself would not justify them in finding the existence of a fraudulent intention on his part in respect to the property proceeded against, at the time that property was found or seized."

The fifth proposition I assent to: "If the jury should find that a fraudulent act was committed by Mr. Lilienthal in 1865, in respect to property then in his possession, this alone, unless supported by other evidence, is not sufficient to warrant them in finding the existence of a fraudulent intent on his part in regard to the property found in his possession in 1868, and will not justify a verdict of condemnation."

The sixth proposition I assent to: "The act of July 13th, 1866, did not require manufacturers of tobacco to make return to the assessor of the quantity of tobacco manufactured by them."

The seventh proposition I assent to: "If the jury shall find, as a fact, that Mr. Lilienthal made returns of goods manufactured by him, from month to month, in no other way than by reporting the amount of such goods sold or removed within the same periods respectively, that fact is no evidence to support a verdict of condemnation, unless the jury shall believe that that mode of making returns was adopted or used with fraudulent intent on the part of Mr. Lilienthal, or of the persons employed in making such returns." The mere fact amounts to nothing, unless you shall believe that there was a fraudulent intent in connection with it.

The eighth proposition I assent to: "If the jury find that Mr. Lilienthal failed to make return of all the goods sold which he had purchased of other manufacturers, such failure is no evidence to support a verdict of condemnation, unless it was with a fraudulent intent on the part of Mr. Lilienthal, or of the persons employed in making such returns."

The ninth proposition is this: "If the jury shall find that, in 1865,"—this is the Kearney & Waterman transaction again—"Mr. Lilienthal returned for taxation, and paid a tax of twenty-five cents per pound upon, thirty-four hundred pounds and thirty-six hundred pounds of tobacco shipped in 1867 to W. T. Coleman in California, then he became liable to no additional tax by reason of said shipment of said tobacco at that time." There is no doubt about that. If the government should sue Mr. Lilienthal to-day for fifteen cents a pound tax on that tobacco, it would be a perfect defence for him to show that he had paid twenty-five cents a pound tax upon it.

The tenth proposition I assent to: "If the jury shall find that, at the time of the shipment of the thirty-four hundred pounds and thirty-six hundred pounds of tobacco, in 1867, to W. T. Coleman in California, the claimant believed that all the tax due thereon to the government had already been paid, then his failure to return said tobacco for taxation upon said shipment is no evidence of fraudulent intent on the part of the claimant." That is a correct proposition. If you believe that Mr. Lilienthal, with his knowledge of that transaction of 1865, with the view of it held by him, which he testified to here, believed that the tax was due to the government at the time he paid it, he could have had no fraudulent intent; and it is for

you to say what his belief was, in regard to its bearing upon the question of intent, but it must, as I have said before, have been a payment of a tax which Mr. Lilienthal honestly believed at the time he was bound to pay, and not a payment of a tax merely, because it was going to be raised the next day to thirty-five cents a pound.

The eleventh proposition I assent to: "The words, 'in fraud of the internal revenue laws,' as used in the forty-eighth section of the act of June 30th, 1864, are simply equivalent to the words, 'in fraud of the internal revenue.' "

The twelfth proposition I assent to: "Acts in violation of the internal revenue laws are not acts in fraud of the internal revenue laws, within the meaning of section 48, unless such acts are accompanied by an intent to defraud the United States." That is an abstraction which I certainly should not care to dissent from.

The other two propositions are questions of fact, addressed to me, to charge you that there is no evidence of this or that, which I decline to charge.

The propositions on the part of the government are substantially what I have already stated, but I will go over them, for the purpose of saying that I assent to them.

"First. If the jury find that the books, exhibits Nos. 138 and 138a, were kept by Mr. Lilienthal, or his agents, as and for the account in book form required to be kept by the provisions of the ninetieth section of act of June 30th, 1864, as amended by the ninth section of the act of July 13th, 1866, and that the said Lilienthal and his agents have therein kept no account of the quantity of tobacco or snuff manufactured by said C. H. Lilienthal at his factory in Washington street, from August 1st, 1866, to January 1st, 1868; that quantities of tobacco and snuff were removed for sale and removed from the said place of manufacture during said period, and that no account of the tobacco and snuff so removed was kept, as of removals thereof, and no accurate account of the tobacco and snuff so removed was kept in any manner in said books;"—that refers to the sales over the retail counter, of which no record was kept as sales—"that large quantities of granulated tobacco, and other descriptions of tobacco, manufactured, were sold by Mr. Lilienthal during said period, and that no account of such sales, as sales, was kept in those books; that quantities of purchased and manufactured tobacco were sold and removed from the said premises during the period from August 1st, 1866, to December 1st, 1867, and that no accurate account of such sales or removals was kept in said books; that exhibits numbered 1 to 17, both inclusive, were furnished to the assistant assessor of the district by said C. H. Lilienthal or his agents, as true and accurate abstracts of all such sales and removals, and were not true and accurate abstracts thereof;"—that means, not that they were not true and accurate abstracts of the books which Mr. Lilienthal kept, not that Mr. Denneker did not transfer them accurately from his tax book into the return, but that they were not, as recorded by Mr. Davis, true and accurate abstracts of the actual transactions—"that the annual inventories, exhibits 18 and 19, were made out and delivered by said C. H. Lilienthal to the assistant assessor of the district, severally, as true statements and inventories of the matters and things therein contained, as required by the said 90th section, as amended as aforesaid; that it appears, from said inventory and abstracts, that much more chewing tobacco and fine shorts was manufactured in said manufactory during the year 1867, than was declared upon said abstracts to have been manufactured; that a large quantity of smoking tobacco manufactured on said premises had been sold or removed during the year 1867, which had not been returned for taxation upon the said abstracts, and of which no account was contained therein, or in the said books, exhibits Nos. 138 and 138a—then, the burden of proof is upon the claimant to satisfy the jury that the tobacco so manufactured on said premises, and sold or removed, without due account, return and entry made thereof in the said books and abstracts, in the manner required by law, was not so sold and removed in fraud of the internal revenue laws, and with intent to evade the taxes thereon; and, if the claimant shall not have so satisfied the jury of his intent respecting the same, the jury may infer that the claimant's intent in respect of the same was fraudulent, and that his possession of the goods in suit was with the like intent."

I also charge the second proposition: "If the jury find that, prior to August 1st, 1866, when the act of July 13th, 1866, went into effect, changing, in some respects, the rates of taxation on manufactured smoking tobacco, a brand of smoking tobacco known as 'extra long smoking tobacco' had been manufactured by C. H. Lilienthal, by cutting together stripped or stemmed leaf, and stems, in certain proportions, and had been sold and returned for taxation by him as 'smoking tobacco,' subject to a tax of thirty-five cents per pound, under the existing law; that, from the time said act of July 13th, 1866, went into effect, the said 'extra long smoking tobacco,' manufactured as aforesaid, was entered by said Lilienthal in the account required to be kept in book form, by the ninetieth section of the act of June 30th, 1864, as amended by the ninth section of the act of July 13th, 1866, of sales and removals of manufactured tobacco, as 'chewing tobacco,' and was returned upon the abstracts of said accounts required to be furnished monthly to the assistant assessor of the district, by said section, as 'chewing tobacco,' subject to a tax of forty cents per pound, under the provisions of said act of July 13th, 1866; that, after the

said 1st day of August, 1866, said C. H. Lilienthal varied the process of manufacturing said 'extra long smoking tobacco,' by merely increasing the proportion of stem, and, from the 21st day of August, 1866, in each monthly return during the years 1866 and 1867, returned for taxation sales and removals of large quantities of the 'extra long smoking tobacco' so manufactured, as 'smoking tobacco,' subject to a tax of fifteen cents per pound, under the provisions of said act of July 13th, 1866; that the said 'extra long smoking tobacco' returned as 'chewing tobacco,' for taxation, at the rate of forty cents per pound, was sold at seventy cents per pound, and the said 'extra long smoking tobacco,' returned as 'smoking tobacco,' for taxation, at the rate of fifteen cents per pound, was sold at the rate of sixty cents per pound; that no officer of internal revenue was advised by C. H. Lilienthal, or his agents, of the said practice of returning the said 'extra long smoking tobacco,' for taxation, at fifteen cents per pound; that the commissioner of internal revenue had published his instructions and opinion that tobacco so manufactured was subject, under the said act of 1866, to the tax of forty cents per pound, as 'smoking tobacco,' and never directly or indirectly countenanced or sanctioned the practice of said C. H. Lilienthal in returning the said 'extra long smoking tobacco;' and if the jury believe, from these facts, that said Lilienthal and his agents made the said change in the process of manufacturing the said 'extra long smoking tobacco,' and the said change in the manner of returning the same for taxation, during the said period from August 1st, 1866, to January 1st, 1868, for the purpose of selling and removing the same in fraud of the internal revenue laws, and with intent to evade the payment of taxes thereon, then they would have a right to infer that the claimant and his agents had the like intent with respect to the property in suit."

I believe those are all the considerations which it is necessary to present to you in regard to this matter. You have listened patiently to the evidence, and to the summing up of the counsel, which has been exceedingly clear and thorough on both sides, and it is for you to say, on your oaths, what you believe to have been the intent of Mr. Lilienthal in respect to this property so seized. If the government has not made out, to your satisfaction, that such intent to commit a fraud upon the law, or to evade the payment of taxes, in respect either to the goods on hand, or to the goods to be manufactured out of raw materials on hand, existed on the part of Mr. Lilienthal at the time the goods were seized, your verdict will be for the claimant.

Mr. Rollins (counsel for the claimant), after taking several exceptions to the charge, said: Your honor charged our 10th request, as requested, but, in commenting on it, you stated to the jury, that, if they should find that Mr. Lilienthal believed that he was bound to pay that tax in March, 1865, and did pay it, then his failure to return the tobacco for tax in 1867 was no evidence of fraudulent intent. I take exception to that part of your honor's charge, and request your honor to charge, that, if Mr. Lilienthal believed that he had a right to pay, independent of any question whether he was bound to pay, the fact that he did not subsequently pay in 1867 is no evidence of fraudulent intent.

THE COURT.—That is a new proposition, and is not embraced in the one you handed to me.

Mr. Rollins.—I ask your honor so to charge.

THE COURT.—I do so charge—that, if Mr. Lilienthal believed honestly, when he paid that tax, on the 31st of March, 1865, that, as between him and the government, he, as a tobacco manufacturer had, at that time, a right to pay that tax, there was no fraudulent intent in his so doing. There is no doubt of that.

Mr. Rollins.—I also take exception to your honor's charging as requested by the district attorney, in both instances. We endeavored to embrace in our requests all we deemed important, but one thing is suggested by your honor's charge, which, I have no doubt, your honor will charge, and that is this—that, if the jury shall believe that the mode of returning for taxation the goods sold over the retail counter, by returning them at the time they were transferred to such retail counter, was adopted for the convenience of the claimant, and used without any fraudulent intent on the part of Mr. Lilienthal or his agents in his business as a manufacturer, such fact furnishes no evidence in support of a verdict of condemnation in this case.

THE COURT.—Yes, that is true. The mere naked fact that that was unlawful does not amount to anything; but if, it being so unlawful, the jury believe there was a fraudulent intent in so doing, it is to be taken into consideration. If the jury believe there was no fraudulent intent in it, it is not to be taken into consideration.

Mr. Rollins.—We made no request to charge as to the rate of tax that was really due on the "extra long smoking tobacco," and we are inclined to think that the proposition of your honor, that it makes no difference, for the purposes of this case, what the rate of tax was, is correct, but, at the same time, as this case involves such a large sum of money, we are unwilling that any failure on our part to take proper exceptions should occur, and, therefore, we ask your honor to charge as follows: "If the jury find that, in the process of manufacturing the 'extra long smoking tobacco,' a portion of the stem was removed from the leaf, and an amount of stem fully equal to or exceeding the quantity removed was subsequently, during said

process, added to and intermingled with the leaf, so that, in point of fact, the manufactured product was composed of both stem and leaf, and so sold, that tobacco was, between August, 1866, and the date of seizure, liable to a tax of only fifteen cents per pound, and was properly returned at that rate."

THE COURT.—I refuse to charge that.

Mr. Rollins.—To which refusal I except. I also ask your honor to charge, "that the 'extra long smoking tobacco,' if manufactured in the manner testified to by Mr. Denneker, was smoking tobacco made in part of stems, and was liable, under the act of July 13th, 1866, to a tax of fifteen cents per pound, during all the time subsequent to August 1st, 1866, and prior to the date of the seizure of the property proceeded against in this action."

THE COURT.—I decline to charge that.

Mr. Rollins.—To which I except. I also ask your honor to charge, "that, if the 'extra long smoking tobacco' returned as liable to the fifteen cents rate, was manufactured in the manner stated in the testimony of Mr. Denneker, and contained a quantity of stem as great as, or greater than, that which grew with the leaf contained in said tobacco, then the said tobacco was liable, between August 1st, 1866, and the time of the seizure of the property herein proceeded against, to the fifteen cents tax, as returned."

THE COURT.—I decline to charge that.

Mr. Simons, Asst. Dist. Atty.—As they have taken formal exceptions, we wish to do the same on our part. We ask your honor to charge as follows, which is the converse of their proposition on the law point: "That the tobacco manufactured by C. H. Lilienthal, and sold by him, from the 1st day of August, 1866, through the years 1866 and 1867, under the name of 'extra long smoking tobacco,' and returned for tax as 'smoking tobacco,' at the rate of fifteen cents per pound, was smoking tobacco stemmed or butted, within the meaning of the provisions of the ninety-fourth section of the act of congress, approved June 30th, 1864, as amended by the ninth section of the act of congress, approved July 13th, 1866, and subject, by such provisions, to a tax of forty cents per pound on such sales."

THE COURT.—I decline so to charge; and I refuse to charge in accordance with any of the propositions respecting the proper rate of tax on the "extra long smoking tobacco," not that I agree with, or dissent from, any of such propositions, but because I do not suppose it to be necessary for the purposes of this case so to charge.

The jury returned a verdict in favor of the government, condemning the property seized.

[Motions for new trial and in arrest of judgment were subsequently overruled. See Cases Nos. 16,106 and 16,106a.]

All the rulings of the court, in its charge, were affirmed by the circuit court (Woodruff, Circuit Judge), on writ of error, in December, 1872. [Not reported.]